## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN L. HICKMAN, | CASE NO. 3:16-cv-00931-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| | Docs. 1, 3, 4, 9, 10 |
| Defendant. | |

### MEMORANDUM

### I.   Procedural Background

On March 20, 2012, Karen L. Hickman ("Plaintiff") filed as a claimant for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, 1382-1383 ("Act") and Social Security Regulations, 20 C.F.R. §§ 404 et seq., 416 et seq., with a last insured date of June 30, 2014,[1] and claimed a disability onset date of January 18, 2009. (Administrative Transcript (hereinafter, "Tr."), 107-08).

After the claim was denied at the initial level of administrative review, the

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

Administrative Law Judge (ALJ) held a hearing on September 26, 2013. (Tr. 120-48). On October 30, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 120-48).[2] Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on February 27, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7).

On April 29, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits. (Doc. 1). On July 6, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 3, 4). On February 12, 2016, Plaintiff filed a brief in support of the appeal. (Doc. 9) ("Pl. Brief")). On March 16, 2016, Defendant filed a brief in response. (Doc. 10 ("Def. Brief")). On November 7, 2016, the Court referred this case to the undersigned Magistrate Judge.

## II.     Relevant Facts in the Record

### A. Education, Age, and Vocational History

Plaintiff was born in July 1969 and classified by the Regulations as a younger individual at the time of the ALJ decision. (Tr. 115); 20 C.F.R. §

_____

[2] The ALJ found no basis to re-open Plaintiff's prior application for DIB benefits and that res judicata barred consideration of the time period through July 1, 2010. (Tr. 107) (July 2010 decision at Tr. 150-163).

404.1563(c).  She had a GED and past work experience as a custodian in a school district and in a hospital and an order picker.  (Tr. 144, 185, 225).  Plaintiff asserts that she is disabled due to due to several impairments, including chronic neck pain, bulging discs in neck and back, depression, and reversed cervical lordosis.  (Tr. 224).  Earnings reports demonstrate that from earned four quarters of coverage from 1986 to 2008.[3]  (Tr. 214).

### B. Relevant Treatment History and Medical Opinions

### 1.    Consultative Evaluation: Sara Cornell, Psy.D. 419-26

On June 26, 2012, Dr. Cornell examined Plaintiff and rendered an opinion regarding Plaintiff's psychological based limitations.  (Tr. 421-26).  Dr. Cornell noted that Plaintiff arrived alone to the examination and was pleasant, and cooperative.  (Tr. 424).  Dr. Cornell observed that Plaintiff was alert and oriented to person, place, and time, presented with a constricted affect and dysphoric mood.  (Tr. 424).  Dr. Cornell noted no evidence of a formal thought disorder and that Plaintiff's thought processes were relevant and goal-oriented.  (Tr. 424).  Dr. Cornell noted that Plaintiff exhibited fair attention and concentration but was easily distracted.  (Tr. 424).  Dr. Cornell stated that Plaintiff appeared to have poor judgment and poor insight into her difficulties.  (Tr. 424).

---

[3] A quarter of coverage represents a minimum amount of taxable income based on a statutory formula that reflects the national average wage. *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n.4 (M.D. Pa. Sept. 30, 2015).

Plaintiff reported a history of depressive symptoms which started six years prior and have worsened over time.  (Tr. 424).  Plaintiff denied any history of suicidal ideation or intent, denied any issues with anger, and denied any history of anxiety, paranoia, or hallucinations.  (Tr. 424).  Plaintiff reported a history of experiencing chronic pain in her back due to herniated and bulging discs.  (Tr. 425).  Plaintiff reported experiencing frequent numbness in her right arm, side, and right foot.  (Tr. 425).  Plaintiff reported a history of neck pain due to a work-related injury that occurred about ten years ago which resulted in herniated and bulging discs in that area.  (Tr. 425).  Plaintiff reported participating in physical therapy, and receiving epidural injections, without success in eliminating her pain.  (Tr. 425).  Plaintiff reports having a prescription of Vicodin (750 mg) and Cymbalta (90 mg).  (Tr. 425).  Plaintiff reported that she had twice participated in counseling at ReDCo but discontinued services there and had also received counseling at NHS.  (Tr. 425).  Plaintiff reported experiencing the following symptoms on a daily basis: sadness, crying, lethargy, anhedonia, pessimistic thinking, low self-esteem, self-criticism, poor self-efficacy, feelings of discouragement, guilt, inadequacy, helplessness, worthlessness, and hopelessness, loneliness, and isolation from others.  (Tr. 425).

Plaintiff reported experiencing mood swings "but these changes in mood range from 'depressed' to 'very depressed.'"  (Tr. 425).  Dr. Cornell noted that

Plaintiff demonstrated short-term memory deficits and forgetfulness. (Tr. 425).

Plaintiff reported being unable to recall anything from the previous day. (Tr. 425).

Plaintiff reported experiencing poor sleep quality and needing to nap frequently

throughout the day. (Tr. 425). Dr. Cornell observed that Plaintiff's "gait, posture

and general movements [were] remarkable for pain." (Tr. 425). Dr. Cornell noted

that Plaintiff had fair eye contact and fair social skills. (Tr. 425). Dr. Cornell

noted the Plaintiff had difficulty providing examples for the likely outcomes of her

behaviors or what she would do in various imaginary situations. (Tr. 425). Dr.

Cornell diagnosed Plaintiff with Major Depressive Disorder, single episode, severe

without psychotic features and assessed her with a current GAF score of 40.[4] (Tr.

425-26).

-------

[4] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014)
("The GAF score allows a clinician to indicate his judgment of a person's overall psychological,
social and occupational functioning, in order to assess the person's mental health illness.
*Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set
within a particular range if either the symptom severity or the level of functioning falls within
that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF
rating is the single value that best reflects the individual's overall functioning at the time of
examination. The rating, however, has two components: (1) symptom severity and (2) social and
occupational functioning. The GAF is within a particular range if *either* the symptom severity *or*
the social and occupational level of functioning falls within that range. When the individual's
symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the
two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication
or major impairment in several areas, such as work or school, family relations, judgment,
thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents
moderate symptoms or any moderate difficulty in social, occupational, or school functioning.
*Id.*").

Page **5** of **38**

Dr. Cornell completed a form indicating that Plaintiff had no restriction in the ability to interact appropriately with the public, and had a slight restriction in the ability to understand, remember and carry out short, simple instructions and interact appropriately with coworkers and supervisor(s). (Tr. 421). Dr. Cornell indicated that Plaintiff had a moderate restriction in the ability to: 1) understand, remember and carry out short, detailed instructions; 2) make judgments on simple work-related decisions; 3) respond appropriately to work pressures in a usual work setting, and; 4) respond appropriately to changes in a routine work setting. (Tr. 421). Dr. Cornell wrote that Plaintiff's impairment affects her ability to socialize and her response it to isolate herself. (Tr. 422). Dr. Cornell opined that Plaintiff could manage benefits in her own best interest. (Tr. 422).

### 2.   James P. Jacques, D.O.

In a letter to Dr. Jacques dated April 7, 2006, Dr. Joseph Grassi, M.D. summarized findings from a pain consultation and assessed Plaintiff with: 1) cervicalgia right upper extremity, possible C6 or 7 radicular symptomatology; 2) median neuritis level of the wrist, probable carpal tunnel syndrome; 3) impingement syndrome right shoulder, and; 4) myofascitis upper back and neck. (Tr. 413-15). In a physical therapy discharge report dated June 12, 2007, Plaintiff's activities of daily living were noted; muscle strength, cervical range of motion, and shoulder range of motion were evaluated. (Tr. 416). The physical

therapist opined that her prognosis was good, she met her goals of decreasing pain to 2 out of 10, increasing cervical and shoulder range of motion, reducing abnormal sensation of radicular symptoms, able to sit up to one hour at a time, and ability to be independently complete light housework, heavy housework, meal preparation, and driving up to sixty minutes.   (Tr. 416-18).   Plaintiff was discharged due to non-compliance based on failure to return after April 25, 2007. (Tr. 418).

In a letter to Dr. Jacques dated February 5, 2009, Dr. Charles Norelli, M.D., summarized findings from a consultation for shoulder pain.  (Tr. 411-12).  Dr. Norelli noted that Plaintiff was depressed and Cymbalta was tried earlier with "some improvement." (Tr. 411-12). Examination of the cervical spine revealed paracervical tenderness upon palpation, active range of motion of 45 degrees rotation to the left and passive range of motion of 50 degrees rotation to the left. (Tr. 411). Dr. Norelli noted that motor strength was normal throughout and Plaintiff demonstrated diminished reflexes. (Tr. 411-12). Dr. Norelli opined that Plaintiff had "primarily a benign myofascial pain disorder," that the "C-spine MRI ha[d] very minimal findings," Plaintiff had "numerous medications that [were] not effective and should be withdrawn." (Tr. 412). Dr. Norelli recommended to stop Fioricet, Flexeril, Zanaflex (laper), and Relafen and noted that usually he does not recommend opiates for myofascial pain.  (Tr. 412).  Dr. Norelli recommended

considering Sertraline as a replacement for Cymbalta and that trying massage to address pain was reasonable to consider. (Tr. 412).

May 1, 2012, Dr. Jacques completed an assessment of Plaintiff's physical limitations. (Tr. 401-05). Dr. Jacques wrote that he had seen Plaintiff from January 30, 2004, to April 26, 2012. (Tr. 401). Plaintiff was diagnosed with depression in 2004 and cervical radiculopathy in 2006. (Tr. 401). Dr. Jacques wrote that Plaintiff had cervical pain with radiation to right arm for ten years in addition to severe depression without suicidal ideation. (Tr. 401). Plaintiff had been treated with Vicodin and physical therapy, that sitting and standing exacerbates the pain while ice and Vicodin alleviates the pain. (Tr. 401). Dr. Jacques indicated that there was paravertebral muscle spasm in the T1-T3 for ten years. (Tr. 401). Dr. Jacques indicated that Plaintiff had negative straight leg raising tests, her sensation was intact to light touch, her motor strength was normal, and she had no atrophy. (Tr. 401-02). Dr. Jacques noted that Plaintiff demonstrated full range of motion in the dorso-lumbar regions, upper extremities, and lower extremities. (Tr. 402, 406-07). Dr. Jacques indicated that Plaintiff had the following diminished range of motion in the cervical regions: 1) 15 degrees forward flexion (out of a possible 30 degrees); 2) 15 degrees backward extension (out of a possible 30 degrees); 3) 15 degrees neck rotation (out of a possible 45 degrees); 4) 10 degrees left lateral flexion (out of a possible 40 degrees), and; 5) 5

degrees right lateral flexion (out of a possible 40 degrees). (Tr. 402). However, in another form, he indicated that Plaintiff demonstrated 5 degrees of left and right lateral flexion, flexion, extension, as well and left and right rotation. (Tr. 407). Dr. Jacques noted that Plaintiff did not use any assistive device for ambulation, that her gait was normal, and wrote "normal" to describe her ability to: 1) get on and off the examining table; 2) walk on heels and toes; 3) squat; 4) arise from a squatting position, and; 5) arise from a chair. (Tr. 403). Dr. Jacques noted that Plaintiff has not had surgery performed. (Tr. 403). Dr. Jacques completed a check-mark opinion indicating that Plaintiff could: 1) occasionally lift and carry up to 100 pounds; 2) stand and walk a total of 1 hour or less in an 8-hour day; 3) sit two hours a day; and, 4) never bend, kneel, crouch, stoop, balance, or climb. (Tr. 403-05). Dr. Jacques noted that Plaintiff had a severe limitation in the ability to use upper and lower extremities and checked boxes indicated that Plaintiff's impairment affected her reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, smelling, and continence. (Tr. 404-05). With regard to environmental limitations, Dr. Jacques noted that humidity affected the degree of pain that Plaintiff experienced. (Tr. 405). Dr. Jacques did not respond to the form questions requesting explanation in support of his medical findings. (Tr. 404-05). Dr. Jacques concluded the form writing that Plaintiff was still very depressed and getting psychotherapy. (Tr. 408).

### 3.    Psychiatric Review Technique: James Vizza, Psy.D.

On July 24, 2012, Dr. Vizza reviewed the medical record and rendered an opinion regarding Plaintiff's psychological based work impairments. (Tr. 179-85). Dr. Vizza opined that Plaintiff had: 1) a moderate restriction of activities of daily living; 2) mild difficulties in maintaining social functioning; 3) moderate difficulties in maintaining concentration, persistence or pace, and; 4) no repeated episodes of decompensation, each of extended duration. (Tr. 179). Dr. Vizza opined that Plaintiff was not significantly limited in her ability to: 1) remember locations and work-like procedures; 2) remember and carry out very short and simple instructions; 3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 4) sustain an ordinary routine without special supervision; 5) work in coordination with or in proximity to others without being distracted by them; 6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 7) be aware of normal hazards and take appropriate precautions; 8) travel in unfamiliar places or use public transportation; and, 9) set realistic goals or make plans independently of others. (Tr. 183-84).

Dr. Vizza opined that Plaintiff was moderately limited in her ability to: 1) understand and remember and carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) make simple work-related decisions; and, 4) respond appropriately to changes in the work setting. (Tr. 183-84). Dr. Vizza explained that Plaintiff was able to carry out very short and simple instructions, maintain regular attendance and be punctual, and could complete a normal workday without exacerbation of psychological symptoms. (Tr. 183). Dr. Vizza opined that Plaintiff had no restrictions regarding ability to interact socially. (Tr. 184). Dr. Vizza found that Dr. Jacques' May 2012 opinion was not supported by the evidence in the record, which rendered the opinion less persuasive. (Tr. 184-85). Dr. Vizza found the July 2012 opinion from Dr. Cornell to be consistent with his opinion regarding Plaintiff's psychiatrically based limitations. (Tr. 184). Dr. Vizza concluded that the limitations resulting from psychological impairments do not preclude Plaintiff from performing the basic mental demands of competitive work on a sustained basis. (Tr. 184).

### 4. Non-Examining Opinion: Elizabeth Kamenar, M.D.

On May 18, 2012, Dr. Kamenar reviewed Plaintiff's medical records and rendered an opinion regarding Plaintiff's physical limitations. (Tr. 180-87). Dr. Kamenar noted that Plaintiff could prepare some meals, vacuum, drive, shop, use a computer, lift five to ten pounds, walk twenty to thirty yards and did not use an

ambulatory assistive device. (Tr. 180). Dr. Kamenar noted that Plaintiff wrote out detailed ADLs. (Tr. 180). Dr. Kamenar opined that Plaintiff could never climb ladders and could: 1) occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; 2) stand and/or walk six hours in an eight-hour day; 3) sit six hours in an eight-hour day, and; 4)occasionally climb ramps/stars, balance, stoop, kneel, crouch, and crawl. (Tr. 181). Dr. Kamenar opined that Plaintiff had no limitations in pushing or pulling and no manipulative limitations. (Tr. 181). In support of her opinion Dr. Kamenar cited to Plaintiff's diagnosis of cervical degenerative disc disease, a January 2009 MRI, a February 2009 EMG, and an April 2012 examination where it was noted that Plaintiff had cervical radiculopathy with spasm, negative bilateral straight leg raise (SLR), intact sensation, 5/5 motor strength, equal deep tendon reflexes ("DTRs"), no atrophy; lumbar flexion at 90 degrees, cervical flexion at 5 to 15 degrees, and normal range of motion in bilateral upper and lower extremities. (Tr. 182). Dr. Kamenar also noted that during the April 2012 examination, Plaintiff used no assistive device, presented with normal gait, was able to normal get on/off the examination table, able to rise from the chair, and demonstrated normal walking on heels and toes, normal squatting. (Tr. 182). Dr. Kamenar opined that Plaintiff would be unable to perform past relevant work because Plaintiff was limited to light exertional work that was also simple and routine. (Tr. 186).

### 5. Radiographic Records: Fuhai Li, M.D.; John Fiss, M.D.; Richard P. Kennedy, M.D.

On April 10, 2007, Dr. Li interpreted images of Plaintiff's cervical spine and concluded that they revealed: 1) cervical degenerative changes with disk desiccation; 2) mild disk bulge at the level of C3-4, C4-5 and C5-6 with mild impingement of thecal sac; 3) no spinal canal stenosis; 4) minimal narrowing of the neural foramina at the level of C3-4, C4-5 and C5-6 bilaterally; 5) no evidence of spinal cord lesion or spinal cord compression. (Tr. 301). On January 19, 2009, Dr. Fiss interpreted images of Plaintiff's cervical spine and concluded that they revealed mild degenerative changes resulting in mild right neural foraminal narrowing at C3-C4 and mild central canal narrowing at C5-C6. (Tr. 316). On August 7, 2013, Dr. Kennedy interpreted images of Plaintiff's lumbar spine and concluded that they were unremarkable. (Tr. 470).

### 6. Lehigh Valley Hospital-Cedar Crest: Matthew A. Nussbaum, D.O.; Yuebing Li, M.D.; Bruce Nicholson, M.D.

From January 19, 2009, to January 21, 2009, Plaintiff sought treatment following receipt of an epidural steroid injection from her pain management doctor. (Tr. 303). Plaintiff reported developing a severe headache which was thought to be a spinal headache. (Tr. 303). Dr. Nussbaum summarized that that:

> MRI showed minimal herniated disks for mild degenerative joint
> disease. Surgery felt that there was no surgical intervention that would
> likely help her with her pain at this time. Pain Management felt that a
> blood patch was not indicated in the cervical region for pain at this

time. Neurology agreed that this was not migraine, but likely related
to CSF leak from her prior cervical injection.

(Tr. 303). In an MRI form dated January 19, 2009, it was noted that Plaintiff was

ambulatory with minimal assistance, and able to remember instructions for up to

fifteen minutes. (Tr. 315). During a consultation dated January 19, 2009, Dr.

Nicholson observed that Plaintiff demonstrated a "full range of motion in the

joints, upper and lower extremities without restriction" and that her strength was

intact. (Tr. 327). During consultations dated January 20, 2009, Plaintiff reported a

history of chronic neck pain for years with on month of right arm pain. (Tr. 320).

The attending physician noted that Plaintiff was in discomfort when sitting up.

(Tr. 320, 323). Plaintiff reported that On January 15, 2009, she had another

epidural injection in the lower cervical area, developed a mild headache on the

same day, but she went to work that day and the day after. (Tr. 323). Dr. Li

observed that Plaintiff was alert and oriented to time, place, and person, followed

all commands, had no language deficit, demonstrated a normal attention span,

could register and recall, and knew past medical history "fairly well." (Tr. 324).

Dr. Li also observed that Plaintiff's muscle strength examination in both arms and

legs demonstrated normal tone, normal reflexes which were symmetrical and

average on both sides. (Tr. 324). Plaintiff's sensory examination was

unremarkable. (Tr. 324).

### 7. Pocono Medical Center

On January 20, 2009, it was noted that Plaintiff had no joint or back pain, no previous psychiatric history, no depression, no psychosis, and not suicidal. (Tr. 340). Examination of the back revealed a normal examination with no CVA tenderness, and no tenderness to palpation. (Tr. 341).

### 8. Medical Associates of Monroe Co: Behzad Maghsoudlou, M.D.

In a worker's compensation form dated January 28, 2009, Plaintiff indicated that she injured her neck and shoulders due to heavy mopping. (Tr. 350). On January 29, 2009, Dr. Maghsoudlou noted that Plaintiff exhibited no depression, nervousness, or tension. (Tr. 333). Dr. Maghsoudlou observed that Plaintiff's neck demonstrated some tenderness to touch, no numbness, and that flexion and extension of the neck was normal. (Tr. 333).

In a letter dated February 5, 2009, Dr. Maghsoudlou summarized that Plaintiff was involved in a motor vehicle accident about two years prior and suffered from chronic neck pain with radicular symptoms into her right arm ever since. (Tr. 330). Plaintiff has tried multiple medications, physical therapy, and epidural injections with no relief. (Tr. 330). After receiving a series of injections last month, she developed an acute headache and sought treatment from the emergency department. (Tr. 330). Although the headache resolved, the neck and right arm symptoms continued to worsen. (Tr. 330). The pain was exacerbated by her job and at the time of the letter, she was receiving Worker's Compensation.

(Tr. 330).   Plaintiff reported that surgical options had been discussed and she sought a second opinion by a surgeon at Lehigh Valley Hospital, who did not recommend any more injections or surgical intervention.   (Tr. 330).   During examination, Plaintiff denied depression, anxiety, or psychotic symptoms.   (Tr. 331).   Dr. Maghsoudlou noted that Plaintiff's short term and long term memory was intact, she exhibited 5/5 motor strength throughout with pain to palpation of the right trapezius and right upper paraspinal muscles.   (Tr. 331).   Dr. Maghsoudlou observed that Plaintiff deep tendon reflexes were symmetric and +2 throughout, and that she demonstrated a normal and symmetrical gait. (Tr. 331).

### 9.    Mountain Valley Orthopedics PC: Allister Williams, M.D.

On February 4, 2009 and February 23, 2009, Dr. Williams listed the following current medications for Plaintiff: 1) baclofen; 2) flexeril; 3) florocet; 4) nabumetone; 5) sertraline HCL; 6) tizanidine HCL; and, 7) Vicodin. (Tr. 364, 366). On February 4, 2009, Plaintiff reported back and neck pain, joint pain, or stiffness, and reported experiencing depression.  (Tr. 367).  Dr. Williams stated that while Plaintiff presented as having "classic C6 radiculopathy," he was "surprised that her mild foraminal narrowing and disc herniation could cause such severe symptoms." (Tr. 367).  Dr. Williams recommended an EMG and a second evaluation. (Tr. 367).

On February 23, 2009, Plaintiff denied joint or muscle pain, or back pain and reported frequent or severe headaches, localized numbness, weakness, or tingling. (Tr. 365). Dr. Williams observed that Plaintiff exhibited a normal gait. (Tr. 365). Dr. Williams opined that Plaintiff symptoms stemmed from her cervical spine and that she would benefit from surgery in the form of interval discectomy and fusion. (Tr. 365).

### 10.   Progressive Pain Solutions LLC[5]: Kenneth P. Sun, M.D.

In a letter dated June 5, 2007, Dr. Sun summarized that Plaintiff was in a motor vehicle accident in March 2007 and was in another motor vehicle accident in 2006 where symptoms where alleviated following two months of physical therapy and localized shoulder injections. (Tr. 393). Plaintiff reported experiencing pain in her neck and bilateral upper extremities which includes feeling pain radiating to her right hand. (Tr. 393). Plaintiff reported that the pain affected her work and that she had not worked since March 27 following a failed attempt to return to work. (Tr. 393). Plaintiff reported that she was not able to do much at home, her spouse did most of the chores and she cooked occasionally. (Tr. 393). Plaintiff reported that her pain was exacerbated with prolonged sitting or with standing, that she had difficulty with driving any distance and has had problems with lifting. (Tr. 393). Plaintiff reported minimal improvement after four weeks of physical therapy

---

[5] Many of the handwritten notes are illegible. However, Plaintiff does not cite to any records from this provider or argues that these records are relevant.

and minimal improvement from taking Lyrica for two weeks. (Tr. 393). Plaintiff reported improvement with using ice to her neck region. (Tr. 394).

Examination of Plaintiff's neck revealed "mild paracervical discomfort, although spasms were not actually noted," "excellent range of motion," "anterior flexion was achievable to 45 degrees, extension beyond 15 degrees, and rotational movement to 70 degrees to either side." (Tr. 394). Dr. Sun observed that Plaintiff's back revealed mild tightness of the right levator region, some trigger points that were more prominent on the left, and an "essentially benign" lower back examination. (Tr. 394). Dr. Sun noted that Plaintiff's extremity examination was unremarkable, with no evidence of paresthesias or allodynia, and her sensory examination was within normal limits. (Tr. 394). Dr. Sun observed that Plaintiff had full motor strength of 5/5 in all groups. (Tr. 394). Dr. Sun concluded that an MRI study revealed degenerative disk disease of her cervical spine, some foraminal narrowing, and no significant stenosis noted. (Tr. 394).

On June 8, 2007, June 29, 2007, July 13, 2007, January 15, 2009, Dr. Sun administered steroid injections to the neck. (Tr. 396-99). On July 5, 2007, Plaintiff reported selling and soreness across shoulders due to the injection from June 29, 2007, and she was instructed to try heat packs around the neck and note if there is any improvement. (Tr. 391).

On August 1, 2007, Plaintiff reported unrelenting pain in the neck and shoulder region, trouble sleeping, and her medication of Vicoprofen and Vicodin had been ineffective. (Tr. 388). Plaintiff reported experiencing intermittent radiating pain to her hand and still experiencing paresthesias. (Tr. 388). It was noted that although the medication Skelaxin was made available to Plaintiff, she was "only taking this three times daily" and she tried Lyrica only for one week. (Tr. 388). Upon examination, Dr. Sun observed that Plaintiff was in "moderate distress" and tearful. (Tr. 388). Neck examination revealed "mild to moderate paracervical tenderness." (Tr. 388). Dr. Sun observed that "[s]he was tight in the lower cervical region, especially on the right," "[a]nterior flexion was achievable to 45 degrees and extension 10 degrees," and [r]otational movement was achievable to approximately 45 degrees to either side. (Tr. 388). Upper back examination revealed "marked levator spasm" and there "was also tenderness, especially at the base of the cervical region on the right." (Tr. 388). Dr. Sun noted that examination of the extremities revealed intact sensory and motor function. (Tr. 388). Dr. Sun opined that there was a "significant myofascial component to her pain." (Tr. 388).

Dr. Sun assessed Plaintiff with: 1) multiple level foraminal stenosis; 2) multiple level degenerative disk disease; 3) cervical radiculopathy; 4) cervicalgia. (Tr. 388). Plaintiff expressed concern regarding maintain medication and did not

want to be on medications and Dr. Sun discussed an option of a spinal cord stimulator if her radicular symptoms persist. (Tr. 389). Dr. Sun also noted that Plaintiff's primary care physician started Plaintiff on Cymbalta for depression. (Tr. 389). In a record dated June 25, 2009, Plaintiff called requesting an "out of work" note. (Tr. 374).

### 11.   LVPG Arthritis and Rheumatology: Kerry Miller, M.D.

On June 28, 2013, Dr. Miller observed that Plaintiff showed "more of a myofascial pain syndrome at the cervical and lumbar spine level" than she did have of a generalized pain syndrome such as fibromyalgia. (Tr. 433). Plaintiff did "not have significant multiple tender points or generalized allodynia." (Tr. 433). Dr. Miller noted that Plaintiff had a sleep disorder and headache syndrome and might have mild irritable bowel symptoms related to the abdominal pain. (Tr. 433). Dr. Miller noted that mild instability of the lumbosacral spine could be better assessed with flexion and extension views of the low lumbar area. (Tr. 433). Plaintiff stated she has not had imaging studies of the spine in six years. (Tr. 433). Dr. Miller ordered radiographic imaging and assessed Plaintiff with "fibromyalgia/ mayalgia/ myofascial" pain. (Tr. 433-34).

On August 28, 2013, Dr. Mill noted that Plaintiff had improved. (Tr. 459, 465). Dr. Mill noted that there was no radiculopathy and that "x-rays of Plaintiff's lumbar spine were normal. (Tr. 464). Dr. Miller noted that Plaintiff still had

generalized allodynia, but good range of motion, normal strength and reflexes in all of her extremities. (Tr. 465). Dr. Miller recommended that Plaintiff follow-up in three months. (Tr. 466).

### 12.   Primary Care Physician: Solibe Ufondu, M.D.

May 23, 2012, Plaintiff reported malaise, fatigue, and back pain. (Tr. 482). Dr. Ufondu noted back and neck pain, and normal peripheral pulses bilaterally and noted that he had referred Plaintiff to Dr. Artamonov. (Tr. 482). On July 6, 2012, Plaintiff reported back pain and Dr. Ufondu noted back and neck pain, and normal peripheral pulses bilaterally. (Tr. 480). On October 12, 2012, Plaintiff reported muscle aches and malaise. (Tr. 478). Dr. Ufondu noted neck and back pain, and normal peripheral pulses bilaterally. (Tr. 478). On November 16, 2012, Dr. Ufondu noted back pains. (Tr. 476).

On April 29, 2013, Plaintiff reported experiencing joint pain for the past three months and wants to be assessed for Fibromyalgia. (Tr. 444). Dr. Ufondu noted back, neck, and joint pain. (Tr. 444). On March 13, 2013, Dr. Ufondu noted back pain. (Tr. 486). On April 20, 2012, Dr. Ufondu noted that Plaintiff's neck was non-tender and back examination was normal. (Tr. 484). On May 13, 2013, Plaintiff sought follow-up treatment for her joint pain and malaise. (Tr. 442). Dr. Ufondu noted that Plaintiff did not follow-up on a previous referral to Dr. Artamonov. Dr. Ufondu noted that Plaintiff demonstrated neck, back, and joint

pain. (Tr. 442). Dr. Ufondu again referred Plaintiff to Dr. Mikhail Artamonov to address her neck and shoulder pain. (Tr. 443).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the

claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's construction of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards. *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)). The court may also reverse the Commissioner when substantial evidence does not support the ALJ's decision. *See*

42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A. Weight of Medical Opinions

Plaintiff argues that substantial evidence does not support the ALJ's allocation of little weight to the opinions of Drs. Vizza and Cornell regarding Plaintiff's psychological impairments. Pl. Brief at 5-6. In support for allotting little weight to Dr. Vizza's July 2012 opinion, the ALJ explained:

> Dr. Vizza reviewed the evidence and opined that [Plaintiff]had mild to moderate limitations with regard to the paragraph "B" criteria. He also noted moderate limitations in understanding/memory, concentration/persistence, and adaptation, but no limits in social interaction. This is inconsistent with claimant's own testimony and actual level of activity.

(Tr. 111) (internal citations omitted).  In support for allotting little weight to Dr. Cornell's June 2012 opinion, the ALJ explained that "The longitudinal record, including [Plaintiff's] own testimony, supports no more than mild limitations." (Tr. 111).

Defendant argues that "a psychological consultant's mental RFC opinion is not set forth in Section I of the mental RFC form-which contains a series of checkboxes intended as a worksheet-but rather in Section III, titled 'Functional Capacity Assessment.'"  Def. Brief at 5-6 (citing Program Operation Manual System (POMS) §DI 24510.060(B)(2)(a) & (4)(a)).

With regard to Defendant's argument, the cited section from POMS does not specifically address whether section I of an agency psychological consultant's statement amounts to being a medical opinion.  POMS §DI 24510.060.  The Court observes that "[m]edical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  While "symptoms, diagnosis and prognosis" fall within the definition of "medical opinion," more probative opinions are those that "that reflect judgments about the nature and severity of [a claimant's] impairment(s)" and particularly describe what a claimant

can or cannot do in a typical work setting. *See e.g.*, *Clark v. Colvin*, No. CV 12-1116-RGA-MPT, 2013 WL 3834046, at \*10-11 (D. Del. July 24, 2013); *John v. Colvin*, No. CIV.A. 12-1292, 2013 WL 3369118, at \*8 (W.D. Pa. July 2, 2013) *Fry v. Astrue*, No. 3:09CV747, 2010 WL 2891493, at \*7 (W.D. Pa. July 21, 2010). Within the broad definition of section 404.1527(a)(2) and 416.927(a)(2), section I encompassing Dr. Vizza's "worksheet" is a medical opinion. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c).   Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."   Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion."   20 C.F.R. §§ 404.1527(c), 416.927(c).

Substantial evidence supports the ALJ's allocation of little weight to Dr. Vizza's July 2012 opinion and to Dr. Cornell's June 2012 opinion.  As the ALJ

explained, the longitudinal records, lack of inpatient treatment or therapy, amounts to substantial evidence in support of the ALJ's determination that Plaintiff's level of psychologically-based impairments was less that that reflected in the opinions of Drs. Vizza and Cornell. (Tr. 111).

In the June 2012 assessment, Dr. Cornell opined that Plaintiff had a moderate restriction in the ability to: 1) understand, remember and carry out short, detailed instructions; 2) make judgments on simple work-related decisions; 3) respond appropriately to work pressures in a usual work setting, and; 4) respond appropriately to changes in a routine work setting. (Tr. 421). In the July 2012 assessment, Dr. Vizza adopted Dr. Cornell's June 2012 opinion and concluded that Plaintiff was moderately limited in her ability to: 1) understand and remember and carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) make simple work-related decisions; and, 4) respond appropriately to changes in the work setting. (Tr. 183-84).

However, Plaintiff testified that the reason why she could not work was due to her physical impairments. (Tr. 128). Plaintiff testified that she used to love to read but no longer reads due to headaches and her neck symptoms. (Tr. 132-33). Plaintiff did not testify to having any limitations due to psychological impairments. (Tr. 120-148).

The longitudinal medical records do not reflect moderate psychological impairments. On January 20, 2009, Dr. Li observed that Plaintiff was alert and oriented to time, place, and person, followed all commands, had no language deficit, demonstrated a normal attention span, could register and recall, and knew past medical history "fairly well." (Tr. 324). On January 20, 2009, it was noted that Plaintiff had no previous psychiatric history, no depression, no psychosis, and was not suicidal. (Tr. 340). On January 29, 2009, Dr. Maghsoudlou noted that Plaintiff exhibited no depression, nervousness, or tension. (Tr. 333). During examination, Plaintiff denied depression, anxiety, or psychotic symptoms. (Tr. 331). Dr. Maghsoudlou noted that Plaintiff's short term and long term memory was intact. (Tr. 331). On February 4, 2009 and February 23, 2009, Dr. Williams noted that Plaintiff was taking sertraline. (Tr. 364, 366). On February 4, 2009, Plaintiff reported experiencing depression. (Tr. 367). In February 2009, Dr. Norelli noted that Plaintiff was depressed and Cymbalta was tried earlier with "some improvement." (Tr. 411-12). Dr. Norelli recommended considering Sertraline as a replacement for Cymbalta. (Tr. 412). The next mention of mental health treatment occurs in 2012. During the May 2012 examination with Dr. Jacques, Plaintiff reported that she was diagnosed with depression in 2004. (Tr. 401). Dr. Jacques wrote that Plaintiff had severe depression without suicidal ideation. (Tr. 401).

Based on the foregoing, substantial evidence supports the ALJ's allocation little weight to the opinions of Drs. Vizza and Cornell regarding Plaintiff's psychological impairments.

## B. Residual Functional Capacity

Plaintiff asserts that the "full record reveals that [cervical disc degeneration and fibromyalgia/myofascial pain syndrome] significantly limited her ability to perform basic work activities." Pl. Brief at 5. Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Plaintiff could plaintiff could lift/carry 10 pounds frequently and up to 20 pounds, occasionally balance, stoop, crouch, crawl, kneel, and climb but never on ladders, ropes, or scaffolds. Pl. Brief at 5.

The final responsibility for deciding a claimant's residual functional capacity is an issue reserved to the Commissioner.    20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).    Administrative law judges determine a claimant's residual functional capacity based on all of the relevant medical and other evidence and are not bound by any findings made by State agency medical or psychological consultants. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-6P (ALJ is "not bound by any findings made by State agency medical or psychological consultants").   It is permissible for the ALJ to reject all opinions from non-treating physicians to independently formulate the

RFC based on the medical and non-medical evidence in totality. *See* 20 C.F.R. §§ 404.1527, 416.927 ("administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists"); 20 C.F.R. §§ 404.1545, 416.945 (paragraph (a) stated that the RFC is "based on all the relevant evidence in [the] record" and paragraph (e) stated that "all of the medical and nonmedical evidence" will be considered in formulating the RFC).

Plaintiff's brief recounts the evidence that supports her claim for disability, however, the question:

> is not whether substantial evidence supports Plaintiff's claims, or whether there is evidence that is inconsistent with the ALJ's finding.... Substantial evidence could support both Plaintiff's claims and the ALJ's finding because substantial evidence is less than a preponderance. *Jesurum v. Sec'y of U.S. Dep't. of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If substantial evidence supports the ALJ's finding, it does not matter if substantial evidence also supports Plaintiff's claims. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).

*Weidow v. Colvin*, Civ. No. 15-765, 2016 WL 5871164 at *18 (M.D. Pa. Oct. 7, 2016); *see also Skow v. Colvin*, No. 1:14-CV-901, 2015 WL 4636914, at *4 (M.D. Pa. July 31, 2015). The Court finds that "a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached" and thus the ALJ's decision is supported by substantial evidence. *See Monsour Med. Ctr. v. Heckler,*

806 F.2d 1185, 1190 (3d Cir.1986); *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d

Cir.1999); *Johnson,* 529 F.3d at 200.

Plaintiff argues that the ALJ "discounted" Plaintiff's cervical disc

degeneration and fibromyalgia/myofascial pain syndrome by stating that they

caused more than minimal functional limitations in Plaintiff's ability to perform

certain basic work activities. Pl. Brief at 5. Ultimately, the outcome of the case

depends on the demonstration of the functional limitations of the disease or

impairment rather than the mere diagnosis of the disease or name of the

impairment. *See Walker v. Barnhart,* 172 F. App'x 423, 426 (3d Cir. 2006) (citing

to *Alexander v. Shalala,* 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom.*

*Alexander v. Comm'r of Soc. Sec.,* 85 F.3d 611 (3d Cir. 1996)).

The longitudinal record supports the ALJ's findings. There are records that

demonstrate either a contradiction in Plaintiff's subjective symptoms with medical

records, or instances where health professionals remark that the degree of

subjective symptoms are not expected from the objective evidence. For example,

the physical therapy discharge report dated June 12, 2007, noted that Plaintiff's

prognosis was good and that she met her goals of significantly decreasing pain,

increasing cervical and shoulder range of motion, reducing abnormal sensation of

radicular symptoms, being able to sit up to one hour at a time, and being able to

independently complete light housework, heavy housework, meal preparation, and

driving up to sixty minutes. (Tr. 416-18). Plaintiff was discharged due to non-compliance based on failure to return after April 25, 2007. (Tr. 418). However, on June 5, 2007, Plaintiff reported minimal improvement after four weeks of physical therapy. (Tr. 393). On February 4, 2009, Dr. Williams stated that while Plaintiff presented as having "classic C6 radiculopathy," he was "surprised that her mild foraminal narrowing and disc herniation could cause such severe symptoms." (Tr. 367). In a letter to Dr. Jacques dated February 5, 2009, Dr. Norelli noted that the cervical spine revealed paracervical tenderness upon palpation, active range of motion of 45 degrees rotation to the left and passive range of motion of 50 degrees rotation to the left. (Tr. 411). Dr. Norelli noted that motor strength was normal throughout and Plaintiff demonstrated diminished reflexes. (Tr. 411-12). Dr. Norelli opined that Plaintiff had "primarily a benign myofascial pain disorder," that the "C-spine MRI ha[d] very minimal findings," and Plaintiff had "numerous medications that [were] not effective and should be withdrawn." (Tr. 412).

Several records note that Plaintiff exhibited a full range of motion in her extremities and back, had a fair range of motion in her neck, and had a normal gait. During a consultation dated January 19, 2009, Dr. Nicholson observed that Plaintiff demonstrated a "full range of motion in the joints, upper and lower extremities without restriction" and that her strength was intact. (Tr. 327). On January 20, 2009, it was noted that Plaintiff had no joint or back pain. (Tr. 340).

Examination of the back revealed a normal examination with no CVA tenderness, and no tenderness to palpation. (Tr. 341). On January 28, 2009, Dr. Maghsoudlou observed that Plaintiff's neck demonstrated some tenderness to touch, no numbness, and that flexion and extension of the neck was normal. (Tr. 333). On February 5, 2009, Dr. Maghsoudlou noted that Plaintiff exhibited 5/5 motor strength throughout with pain to palpation of the right trapezius and right upper paraspinal muscles. (Tr. 331). Dr. Maghsoudlou observed that Plaintiff's deep tendon reflexes were symmetric and +2 throughout, and that she demonstrated a normal and symmetrical gait. (Tr. 331). On February 23, 2009, Plaintiff denied joint or muscle pain, or back pain and reported frequent or severe headaches, localized numbness, and weakness or tingling. (Tr. 365). Dr. Williams observed that Plaintiff exhibited a normal gait. (Tr. 365). After a three year gap in treatment, on May 1, 2012, Dr. Jacques wrote that he had seen Plaintiff from January 30, 2004, to April 26, 2012. (Tr. 401). Dr. Jacques indicated that there was paravertebral muscle spasm in the T1-T3 for ten years. (Tr. 401). Dr. Jacques indicated that Plaintiff had negative straight leg raising tests, her sensation was intact to light touch, her motor strength was normal, and she had no atrophy. (Tr. 401-02). Dr. Jacques noted that Plaintiff demonstrated full range of motion in the dorso-lumbar regions, upper extremities, and lower extremities. (Tr. 402, 406-07). Dr. Jacques indicated that Plaintiff had the following diminished range of motion

in the cervical regions: 1) 15 degrees forward flexion (out of a possible 30 degrees); 2) 15 degrees backward extension (out of a possible 30 degrees); 3) 15 degrees neck rotation (out of a possible 45 degrees); 4) 10 degrees left lateral flexion (out of a possible 40 degrees), and; 5) 5 degrees right lateral flexion (out of a possible 40 degrees). (Tr. 402). Dr. Jacques noted that Plaintiff did not use any assistive device for ambulation, that her gait was normal, and wrote "normal" to describe her ability to: 1) get on and off the examining table; 2) walk on heels and toes; 3) squat; 4) arise from a squatting position, and; 5) arise from a chair. (Tr. 403).[6]

On June 28, 2013, Dr. Miller opined that Plaintiff showed "more of a myofascial pain syndrome at the cervical and lumbar spine level" than she did have of a generalized pain syndrome such as fibromyalgia. (Tr. 433). Plaintiff did "not have significant multiple tender points or generalized allodynia." (Tr. 433). Dr. Miller assessed Plaintiff with "fibromyalgia/ mayalgia/ myofascial" pain. (Tr. 433-34). Once treatment commenced, Plaintiff's symptoms improved. On August 28, 2013, Dr. Mill noted that Plaintiff had improved. (Tr. 459, 465). Dr. Mill

---

[6] The Court notes that Dr. Jacques' findings are inconsistent with the form opinion where he completed a check-mark opinion indicating that Plaintiff could: 1) occasionally lift and carry up to 100 pounds; 2) stand and walk a total of 1 hour or less in an 8-hour day; 3) sit two hours a day; and, 4) never bend, kneel, crouch, stoop, balance, or climb. (Tr. 403-05). Without explanation or citation to any evidence in his records, Dr. Jacques noted that Plaintiff had a severe limitation in the ability to use upper and lower extremities and checked boxes indicated that Plaintiff's impairment affected her reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, smelling, and continence. (Tr. 404-05). Dr. Jacques did not respond to the form questions requesting explanation in support of his medical findings. (Tr. 404-05).

noted that there was no radiculopathy and that "x-rays of Plaintiff's lumbar spine were normal. (Tr. 464). Dr. Miller noted that Plaintiff still had generalized allodynia, but good range of motion, normal strength and reflexes in all of her extremities. (Tr. 465).

The ALJ reasonably relied on Dr. Kamenar's May 2012 opinion which described Plaintiff's physical limitations. The ALJ observed that:

> Dr. Kamenar indicated that [Plaintiff] could perform a range of light work with postural and environmental limitations. This assessment is consistent with the longitudinal evidence of record, including her benign physical examinations, benign diagnostic studies, and limited treatment.

(Tr. 114). In contrast to Plaintiff's testimony that she could only lift up to 5 pounds, stand for 20 minutes, sit for 45 minutes, and needed to rest and sleep throughout the day, Dr. Kamenar opined that Plaintiff could: 1) occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; 2) stand and/or walk six hours in an eight-hour day; 3) sit six hours in an eight-hour day, and; 4)occasionally climb ramps/stars, balance, stoop, kneel, crouch, and crawl. (Tr. 181). In support of her opinion, Dr. Kamenar cited to an April 2012 examination where it was noted that Plaintiff had cervical radiculopathy with spasm, negative bilateral straight leg raise (SLR), intact sensation, 5/5 motor strength, equal deep tendon reflexes ("DTRs"), no atrophy; lumbar flexion at 90 degrees, cervical flexion at 5 to 15 degrees,

and normal range of motion in bilateral upper and lower extremities. (Tr. 182). Dr. Kamenar also noted that during the April 2012 examination, Plaintiff used no assistive device, presented with a normal gait, was able to get on/off the examination table, able to rise from the chair, and demonstrated normal walking on heels and toes, normal squatting. (Tr. 182). Dr. Kamenar opined that Plaintiff would be unable to perform past relevant work because Plaintiff was limited to light exertional work that was also simple and routine. (Tr. 186). There is no other expert medical opinion that contradicts that of Dr. Kamenar regarding the abilities and limitations of Plaintiff. In this case, it was reasonable for the ALJ to rely on the expert opinion of Dr. Kamenar in determining Plaintiff's residual functional capacity.

Based on the foregoing, substantial evidence supports the ALJ's RFC determination.

### C. Step Five

Plaintiff argues that substantial evidence does not support the vocational expert testimony at step five because the limitations of the RFC did not include sufficient breaks and resting throughout the day and did not account for Plaintiff's medication regime. Pl. Brief at 6.

An "'ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*' [and] does not have 'to submit to the vocational expert every impairment *alleged* by a claimant.'" *Hughes v. Comm'r Soc. Sec.*, No. 15-2253, 2016 WL 231676, at *3 (3d Cir. Jan. 20, 2016).  The Court notes that:

> [O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).  As discussed above, substantial evidence supports the ALJ's RFC and as such, there is no reversible error at step five.

## IV. Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence.  42 U.S.C. §§ 405(g), 1382c; *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.


Dated: March 31, 2017          _____s/Gerald B. Cohn_____
                               GERALD B. COHN
                               UNITED STATES MAGISTRATE JUDGE